UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA, | ) | Civil Action No. |
| United States Secretary of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | COMPLAINT FOR |
| | ) | ERISA VIOLATIONS |
| v. | ) | (29 U.S.C. § 1001 et seq.) |
| | ) | |
| RELIANCE TRUST COMPANY and | ) | |
| BRADFORD HAMMACHER GROUP, INC. | ) | |
| EMPLOYEE STOCK OWNERSHIP PLAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR ERISA VIOLATIONS**

Plaintiff R. Alexander Acosta, Secretary of the United States Department of Labor (the "Secretary"), alleges as follows:

**PRELIMINARY STATEMENT**

1.        The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., requires fiduciaries of an employee stock ownership plan, when buying stock in the plan's sponsoring company on the plan's behalf, to act prudently and with undivided loyalty to the plan, and to pay no more than fair market value for the stock.  When Reliance Trust Company ("Reliance Trust"), as trustee of the Bradford Hammacher Group, Inc. Employee Stock Ownership Plan (the "ESOP" or "Plan"), agreed in September of 2013 to the purchase of all of the outstanding shares of common stock in Bradford Hammacher Group, Inc. ("BHG" or the "Company") from the Company's now-former shareholders, it failed in each of these respects.

2.        First, Reliance Trust hired a valuation advisor for the transaction, Stout Risius Ross, LLC ("SRR"), and failed to adequately review SRR's Valuation Report and Solvency Analysis.  The Valuation Report was rife with red flags, including projections of BHG's future

financial performance that far outpaced BHG's modest historical performance, with no articulated reason for such a substantial surge in growth, and the use of inappropriate market comparables.  The Valuation Report failed to account for the large debt-load being taken on by the Company as a result of the transaction, the dilutive effect of warrants issued to the former shareholders, the issuance of Stock Appreciation Rights ("SARs"), and a lack of ESOP control of the Company following the transaction.  Reliance Trust also failed to adequately review and meaningfully question SRR's Solvency Analysis that considered only the period from December 31, 2013 through December 31, 2018, and ignored the September 2019 maturation of $195.9 million in notes issued to the former shareholders.

3.      Second, Reliance Trust failed to negotiate in good faith over the price terms and issuance of warrants to the former shareholders.  Reliance Trust agreed to pay the maximum authorized amount to the former shareholders and without advantageous terms regarding a loan to the ESOP, the issuance of warrants to the former shareholders, and the granting of SARs.

4.      By the actions and omissions specified above, Reliance Trust breached its duties of prudence and loyalty, in violation of ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), and entered into a non-exempt prohibited transaction, in violation of ERISA section 406(a), 29 U.S.C. § 1106(a), when on September 30, 2013 it caused the purchase of 100% of BHG's stock (the "ESOP Transaction").  In so doing, Reliance Trust caused the overpayment for stock in the Company by tens of millions of dollars and losses to the Plan under ERISA section 409(a), 29 U.S.C. § 1109(a).  As a result, the Secretary brings this action against Reliance Trust under ERISA sections 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5), to redress Reliance Trust's violations of ERISA and enforce the provisions of Title I of ERISA.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.     Venue with respect to this action lies in the United States District Court for the Northern District of Illinois, pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP is administered in Niles, Illinois, within this district, and the fiduciary breaches at issue in this Complaint occurred within this district.

## PARTIES

7.     The Secretary is vested with authority to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA.  29 U.S.C. §§ 1132(a)(2) and (5).

8.     At all relevant times, Reliance Trust was a full-service trust company with its principal place of business in Atlanta, Georgia.  Its services included acting as the trustee of employee stock ownership plans.  Reliance Trust resigned as the ESOP trustee effective June 30, 2014.  At all relevant times, Reliance Trust was trustee of the ESOP and a fiduciary to the ESOP under ERISA section 3(21), 29 U.S.C. § 1002(21).

9.     The ESOP is an employee benefit plan as defined by ERISA section 3(3), 29 U.S.C. § 1002(3), and is subject to coverage under ERISA pursuant to section 4(a)(1) of ERISA, 29 U.S.C. § 1003(a)(1).  The ESOP also includes The Bradford Hammacher Group Inc. Employee Stock Ownership Trust, which holds the ESOP's assets.  The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

10.    Although not currently parties to this litigation, at all relevant times, the now-former shareholders were all parties in interest to the ESOP pursuant to sections 3(14)(A) and (H) of ERISA, 29 U.S.C. §§ 1002(14)(A) and (H).

## FACTUAL BACKGROUND

11.    BHG was formed on September 23, 2013.  Prior to September 23, 2013, The Bradford Exchange, Ltd. and its eight (8) affiliates, and Hammacher, Schlemmer & Company, Inc., operated as separate entities with common ownership (collectively, the "Predecessor Companies").

12.    The Predecessor Companies were owned by four MacArthur family trusts, Richard W. Tinberg ("Tinberg"), and James D. Liggett ("Liggett") (collectively, the "Former Shareholders").[1]  Two of the trusts, the Voting Trust Dated March 12, 2004 and The Family Marital Trust created under the Gregoire C.R.B. MacArthur Revocable Trust, had combined ownership of over 75% of the outstanding stock of the Predecessor Companies.[2]  Tinberg, also chief executive officer of the Predecessor Companies, and Liggett owned 10% and 7.5%, respectively, of the Predecessor Companies.

13.    Hamilton Worldwide Holdings, Inc., one of the Predecessor Companies, changed its name to Bradford Hammacher Group, Inc. pursuant to a Certificate of Amendment to the Restated Certificate of Incorporation of Hamilton Worldwide Holdings, Inc., dated September

---

[1]  The four MacArthur family trusts and their ownership interests at the time of the ESOP Transaction were: The Voting Trust Dated March 12, 2004 (55%); The Family Marital Trust created under the Gregoire C.R.B. MacArthur Revocable Trust (20.62%); The Grace Elizabeth G. MacArthur Descendant Trust created under the Gregoire C.R.B. MacArthur Revocable Trust (3.44%); and The Henri MacArthur Descendant Trust created under the Gregoire C.R.B. MacArthur Revocable Trust (3.44%).

[2]  Board of Directors member John Rodrick Charles Gordon MacArthur ("MacArthur") and The Solange MacArthur Revocable Trust were the beneficiaries of The Voting Trust.

23, 2013. The Company was authorized to issue 1,000,000 shares of Class A Common Stock and 1,000 shares of Class B Common Stock.

14. As part of the transaction establishing the ESOP, all of the other Predecessor Companies became wholly-owned subsidiaries of BHG.

15. Currently, nine subsidiaries are collectively known as The Bradford Group ("Bradford"). The Bradford companies develop, source, and market a wide variety of products including gifts, jewelry, dolls, music boxes, holiday ornaments, home décor, architectural villages, coins, books, personal banking checks, and figurines. Hammacher, Schlemmer & Company, Inc., the tenth subsidiary, is a catalog retailer offering product categories that include apparel, electronics, home living, outdoor living, personal care, sports and leisure, toys and games, travel collections, and proprietary products.

### BHG Hires Verit to Advise on ESOP Creation and Provide an Initial Valuation

16. On May 16, 2013, Tinberg, acting as chief executive officer of the Predecessor Companies, engaged Verit Advisors, Inc. ("Verit") to provide "ESOP financial advisory and investment banking services." Specifically, Verit was hired to advise BHG on "the creation of an employee stock ownership plan . . . and the related sale or redemption of all . . . of the Company stock by the current shareholders . . . to the Company." In its engagement letter, Verit portrays its role as advising BHG "on ownership transition alternatives for the controlling shareholders."

17. As part of its services, Verit and senior Company representatives, including Tinberg, Liggett, and Margaret J. Ostojic ("Ostojic"), hosted a "kickoff" presentation on July 25, 2013. The presentation was attended by both Reliance Trust and SRR. Verit's presentation included among other things, a financial overview of the Company and the proposed transaction,

i.e., the creation of the ESOP, its purchase of a 100% ownership interest in BHG, and the related redemption of all of the Company stock owned by the Former Shareholders.

18.     Verit also presented a summary of its valuation of BHG that valued BHG's equity between $268 million and $290 million, and proposed a price of $290 million for the ESOP Transaction.

**Reliance Trust is Retained as the ESOP's Trustee**

19.     On August 9, 2013, Ostojic, acting as secretary of Bradford Exchange (one of the Predecessor Companies), hired Reliance Trust to serve as trustee for the yet-to-be-formed Plan with respect to the proposed ESOP Transaction.

20.     According to the engagement letter between Bradford Exchange and Reliance Trust as the Plan trustee, "Reliance will assume the fiduciary responsibility for determining, in consultation with its advisors, whether the price proposed to be paid for the shares sold to the ESOP in the Proposed Transaction is not more than their fair market value and whether the Proposed Transaction, including any future management incentive plan adopted in connection with the Proposed Transaction, is fair from a financial viewpoint to the ESOP and its participants."

21.     In the engagement letter, BHG also agreed to indemnify Reliance Trust "against and from any and all claims, damages, expense, liabilities, and losses whatsoever… relating to the [ESOP] Transaction or Reliance's duties as ESOP trustee."

22.     On September 30, 2013, the BHG Board of Directors (the "Board"), which was comprised solely of Tinberg, Liggett, and MacArthur, formally appointed Reliance Trust as the trustee for the ESOP.

23.     Also on September 30, 2013, BHG and Reliance Trust entered into a trust agreement setting forth the duties and responsibilities of Reliance Trust as the ESOP's trustee, effective as of January 1, 2013 (the "Trust Agreement").

24.     The Trust Agreement provides that the trustee shall discharge its duties "solely in the interest of the Plan participants and their beneficiaries," "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims," and "in accordance with the documents and instruments governing the Plan."

25.     According to the Trust Agreement, the Board is responsible for directing the trustee with respect to the investment of trust assets and sale of Company stock, and has the power to remove the trustee with proper notice.

**Reliance Trust Hires Stout Risius Ross as Its Valuation Advisor**

26.     The Trust Agreement provides that "Company Stock shall be purchased by the Trustee only at prices which do not exceed the fair market value of the shares produced, as determined by the Trustee based upon a valuation by an independent appraiser."

27.     The engagement letter between BHG and Reliance Trust states that "[t]o advise Reliance in connection with its duties as ESOP trustee, Reliance will engage Stout Risius Ross…as an independent appraiser and financial advisor."

28.     Therefore, also on August 9, 2013, Reliance Trust formally engaged SRR as its financial advisor in connection with the proposed ESOP Transaction.

29.     Pursuant to the engagement letter between SRR and Reliance Trust as the ESOP trustee, Reliance Trust hired SRR to provide the following written opinions related to the proposed ESOP Transaction: (1) that the consideration to be paid by the ESOP for its shares of

7

Company stock pursuant to the terms of the proposed transaction is not greater than the fair market value of such shares; (2) that the consideration to be paid by the Company for its shares of stock pursuant to the terms of the proposed transaction is not greater than the fair market value of such shares; (3) that the interest rate on the loan from the Company to the ESOP is not in excess of a reasonable interest rate; (4) that the financial terms of the loan from the Company to the ESOP are at least as favorable to the ESOP as would be the financial terms of a comparable loan resulting from negotiations between independent parties; and (5) that the terms and conditions of the proposed transaction, taken as a whole, are fair to the ESOP from a financial point of view.

### The ESOP Transaction

30.     Legal counsel for BHG drafted a document entitled "The Bradford Group Master Agreement" (the "Master Agreement"). BHG, the ESOP, the Former Shareholders, and all of the Predecessor Companies are parties to the Master Agreement. The Master Agreement sets forth in detail the sequence of events taking place in the multi-step transaction that constitutes the September 30, 2013 ESOP Transaction. In reality, all of the steps occurred simultaneously upon execution of the Master Agreement and its attachments.

31.     The first event that takes place in the September 30, 2013 ESOP Transaction is BHG's creation of the ESOP.

32.     BHG, through its Board, established the Plan effective January 1, 2013. The Plan is a leveraged employee stock ownership plan solely invested in employer securities. Section 12-1 of the Plan Document provides "[t]he authority to control and manage the operation and administration of the Plan is vested in an ESOP Committee." Section 12-1 also designates the

members of the ESOP Committee as named fiduciaries of the Plan. Pursuant to Section 13-1 of the Plan, the Company's Board is responsible for appointing the ESOP Committee.

33. The next step in the ESOP Transaction is the Predecessor Companies' declaration of a one-time dividend payment to the Former Shareholders equal to substantially all the cash and cash equivalents on hand as of September 30, 2013. The Former Shareholders, including Tinberg, Liggett, and MacArthur, as a beneficiary of the MacArthur family trusts, received a partial dividend payment of $66.3 million in cash at closing and an additional $8.36 million on November 18, 2013. As described in the Master Agreement, the dividends were necessary to generate cash for Tinberg and Liggett, thereby enabling them to pay off promissory notes they executed prior to the ESOP Transaction with several of the Predecessor Companies.

34. Pursuant to the Master Agreement, only after retirement of the Tinberg and Liggett promissory notes did the ESOP purchase its 600,000 shares of newly issued BHG Class A Common Stock, constituting 100% of BHG's outstanding stock.

35. To pay for the shares of BHG stock, the ESOP executed a promissory note in the amount of $100 million bearing an annual interest rate of 3.61% (the "ESOP Note"). The ESOP Note requires equal annual payments of principal and interest over a 40-year term.

36. Again, as required by the Master Agreement, only after the ESOP purchased its BHG stock did the Company redeem or acquire by merger "all of its issued and outstanding shares" of BHG and the Predecessor Companies from the Former Shareholders. As a result of this step in the ESOP Transaction, all of the Predecessor Companies became wholly-owned subsidiaries of BHG.

37. The redemption of the Former Shareholders' outstanding shares of BHG stock was negotiated by Verit, on behalf of BHG and the Former Shareholders, and by Reliance Trust as ESOP trustee, on behalf of the ESOP.

38. The Former Shareholders sold all of their interests in the ten surviving entities to BHG for compensation totaling $278.4 million. The Former Shareholders received $82.5 million in cash at closing and $195.9 million in junior subordinated promissory notes from BHG ("Seller Notes"). The Former Shareholders also received 320,000 detachable warrants with an exercise price of $30.00 per share ("Seller Warrants"). The Seller Warrants represented 33.7% of BHG's equity on a fully-diluted basis as of September 30, 2013. In addition, the trustee of three of the four Former Shareholder trusts, Gina MacArthur, was specifically given a seat on the Board of BHG.

39. To finance the ESOP Transaction, BHG obtained a five-year $108 million term loan ("Senior Term Loan") and a $30 million revolving credit facility, which was undrawn at closing, from a consortium of banks led by Bank of America, N.A., and the $195.9 in Seller Notes. According to the terms of the Senior Term Loan, annual principal payments were to be made on January 15th of each year, equal to $16.2 million in 2014, $10.8 million in 2015 and 2016, and $16.2 million in 2017 and 2018. The remaining principal balance was due at maturity on September 30, 2018. The Seller Notes had a six-year term and require interest-only payments until maturity. All outstanding principal and accrued interest was due when the Seller Notes mature on September 30, 2019. The Seller Notes carried an annual interest rate of 4% until September 30, 2016 and 7% thereafter.

40. The economic reality of the ESOP Transaction described above is that the ESOP indirectly acquired 100% of the outstanding shares of the Company for a purchase price of

$278.4 million.  That is the amount paid by the Company to the Former Shareholders in exchange for the ESOP's 100% ownership of the Company.  As a result, at the closing of the ESOP Transaction, the Plan's sole asset, BHG, was burdened with $195.9 million in debt attributable to the Seller Notes.  This debt is currently due with a balloon payment in September 2020.  Given the Company's financial condition, BHG is unlikely to be able to pay the debt when due, which Reliance Trust failed to adequately consider in agreeing to the ESOP Transaction.  In reality, this complex series of transactions all occurred for the benefit of the Former Shareholders and not the ESOP.

41.     In addition to the above terms, BHG established a management incentive plan to grant SARs of up to 10% of BHG's equity, on a fully-diluted basis, to eligible employees.  BHG granted SARs representing 3% of BHG's fully-diluted equity at closing.  The remaining SARs were to be granted based on performance.

42.     BHG also purchased the real estate where the Company's headquarters is located from Old Colony Properties, Co., an Illinois partnership, for $8 million in cash.

43.     According to the Master Agreement for the ESOP Transaction, these concurrent events all had to occur for the ESOP Transaction to be effectuated.  If any one step failed to occur, the Transaction would not occur.  Therefore, the redemption of the Former Shareholders' stock was concurrent and contingent upon the merger of the Predecessor Companies, the ESOP purchase, the establishment of the management incentive plan, and a number of other transactions including the payment of dividends, the purchase of real estate, the payment of an affiliated note, and a deferred compensation payment.

44.     The Master Agreement also contains an indemnification agreement by the Former Shareholders to the benefit of Reliance Trust.  The agreement indemnifies Reliance Trust, as

ESOP trustee, for liabilities and losses caused by any breach of any representation or warranty by the Former Shareholders or the Company under the Master Agreement.

**SRR's Valuation Report Contains Numerous Red Flags**

45. SRR's Valuation Report concluded that a 100% stake in BHG was worth between $245 million and $290 million. Reliance Trust used this valuation to agree to the $278.4 million purchase price of the stock that the Company, and indirectly the ESOP, bought from the Former Shareholders.

46. To arrive at its valuation conclusion, SRR used two valuation methods to which it assigned equal weight: (1) the Guideline Company Method; and (2) the Discounted Cash Flow Method ("DCF Method"). The Guideline Company Method values a company by comparing it to similar publicly traded companies whose market values are readily ascertainable. The DCF Method relies on projections of a company's future earnings and revenue stream in order to value a potential investor's expected return on its investment. The red flags include the following flaws.

*SRR Relied on Overly Optimistic Projections of the Companies' Sales and Earnings*

47. On its face, SRR's valuation of the Companies relied on revenue projections prepared by BHG's management team that put the Company's sales and Earnings Before Interest and Tax ("EBIT") at levels significantly higher than BHG's historical growth rates. SRR provided no supportable reason for the disparities.

48. BHG had faced declining sales since 2007, with its revenue decreasing 20% over that time. BHG's industry overall was impacted by the recession but generally rebounded while BHG's revenues stagnated. SRR nevertheless relied on projections that anticipated revenue growth increasing from 3.9% to 5.8% between 2013 and 2017.

*SRR Did Not Account for the Dilutive Effects of the Warrants Issued to the Former Shareholders on the ESOP's Ownership Interests*

49.     As described above, the parties understood that after the ESOP's stock purchase transaction, the Company would redeem all of the Former Shareholders' remaining shares in BHG and, in exchange, the Former Shareholders would receive Seller Notes—$195.9 million in junior subordinated promissory notes from BHG—and Seller Warrants—320,000 detachable warrants with an exercise price of $30.00 per share.  The 320,000 warrants represented 33.7% of BHG's equity on a fully-diluted basis as of September 30, 2013.  These warrants gave the Former Shareholders the ability to purchase BHG stock at a price below the strike price of the transaction and a right to ownership of more than a third of the Company.  If exercised, the ESOP's equity interest in BHG would be significantly reduced.

50.     In its Fairness Analysis, SRR opined, among other things, that the internal rate of return ("IRR") on the Seller Notes and the Seller Warrants was reasonable when compared to market rates for debt with similar characteristics.  However, SRR's analysis did not discount the fair market value of the BHG stock the ESOP purchased to account for the dilutive effects of the Seller Warrants.  It merely analyzed whether the stock-redemption transaction was "fair to the ESOP."

*SRR Did Not Account for the ESOP's Lack of Control*

51.     The ESOP's purchase of 100% of BHG stock on September 30, 2013, did not result in the Plan obtaining control of BHG since Reliance Trust, as ESOP trustee, did not become a member of the Board after the ESOP Transaction.  Section 11-1 of the Plan Document indicates that the trustee is to vote the ESOP shares as directed by a committee established by the Board, known as the ESOP Voting Committee.  The members of the ESOP Voting Committee are chosen by the Board in its discretion.  At all relevant times, the ESOP Voting Committee was

comprised in all or part of the Former Shareholders and Gina MacArthur. Furthermore, while the agreement specifically designated a position on the Board for Gina MacArthur, the trustee of three of the four Former Shareholder trusts, the ESOP was not designated as a member. Yet SRR's analysis did not include a discount for lack of control of BHG following the purchase of 100% of its outstanding stock.

*SRR Valued the Company by Comparing It to Publicly Traded Companies That Differed in Material Respects*

52.     In applying the Guideline Company Method, SRR selected six publicly traded companies whose product lines and operations SRR deemed "similar" to BHG: CSS Industries, Inc.; Helen of Troy Limited; HSN, Inc.; Liberty Interactive Corporation; Lifetime Brands, Inc.; and United Online, Inc. SRR then calculated the average "multiples" by which the companies' market values exceeded their earnings, and applied these multiples to BHG's earnings to calculate an estimated valuation range for the Company.

53.     According to SRR's own Fairness Analysis, BHG relied on a limited number of distribution channels and offers novelty items and collectables. The selected public companies, on the other hand, had distribution networks that expanded across multiple channels including mass merchant retailers, specialty stores, wholesalers, websites, and television. In addition, many of the selected public companies offered everyday consumer products with recurring sales, such as greeting cards, decorations, personal care, healthcare, houseware, flowers, and fruits. BHG did not offer products with recurring sales.

54.     Further, BHG had total revenue of $510 million for the twelve-month period ending on June 30, 2013, total assets of $246 million as of June 30, 2013, an adjusted Earnings Before Income Taxes Depreciation and Amortization ("EBITDA") margin of 6.9% for the twelve-month period ending on June 30, 2013, and an EBIT margin of 6.2%. However, the

14

public companies selected by SRR had revenue ranging from $350 million to $10.7 billion for the twelve-month period ending on June 30, 2013, total assets ranging from $287.8 million to $24.3 billion as of June 30, 2013, a median EBITDA margin of 10.4% for the twelve-month period ending on June 30, 2013, and a median EBIT of 8.1%. These numbers suggest that the public companies were not actually comparable.

55. In addition, SRR's Fairness Analysis applied a 10% control premium to the selected public multiples without any supporting justification.

*SRR's Solvency Analysis and Solvency Opinion Letter Failed to Properly Account for the Maturation of the Seller Notes*

56. In addition to the Valuation Report, SRR also issued a Solvency Analysis and Solvency Opinion Letter, which were provided to Reliance Trust prior to the ESOP Transaction on September 30, 2013. SRR's Solvency Analysis and Solvency Opinion Letter opined that BHG "should be able to pay its debts as they become absolute and mature."

57. SRR's Solvency Analysis included an examination of BHG's ability to meet its debt obligations, including the debt issued in relation to the ESOP Transaction, from its projected cash flows for the period December 31, 2013 through December 31, 2018.

58. The glaring flaw in SRR's Solvency Analysis is its total failure to consider the effect of the looming debt payments on BHG's financial condition. As part of the ESOP Transaction financing, the Former Shareholders received $195.9 million in Seller Notes. The Seller Notes were to mature on September 30, 2019, and require that the entire principal amount of $195.9 million be paid at maturity. Because SRR's Solvency Analysis only covered the period from December 31, 2013 through December 31, 2018, it did not consider BHG's ability to pay the $195.9 million plus outstanding interest that would be due on the Seller Notes on September 30, 2019. Reliance Trust was aware of the maturity date on the Seller Notes yet failed to

question SRR's Solvency Analysis in any meaningful way regarding this obvious problem. Moreover, BHG's historical earnings showed that it was unlikely BHG could pay the lump sum due.

**Reliance Trust Approved the ESOP Transaction Without Addressing the Red Flags in the SRR Reports**

59. The proposed ESOP Transaction was discussed at a meeting of the Fiduciary Committee of Reliance Trust on August 21, 2013, and approved at a meeting of the ESOP Committee of Reliance Trust on September 25, 2013.

60. The meeting minutes do not reflect any discussion of the following topics: whether SRR should have reduced its valuation (or decreased the total consideration paid to BHG) in light of the warrants issued to the Former Shareholders, the issuance of SARs, or the lack of control by the ESOP; whether SRR's Guideline Companies were in fact comparable to BHG; or whether SRR's Solvency Analysis should have considered the $195.9 million in Seller Notes coming due in September 2019 and the Company's ability to pay that debt.

61. At the conclusion of the September 25, 2013 meeting, Reliance Trust formally approved the ESOP Transaction.

62. The vote occurred despite the fact that the Reliance Trust ESOP Committee received SRR's Valuation Report less than 24 hours before unanimously voting to approve the ESOP Transaction.

63. Reliance Trust, in its capacity as Plan trustee, approved the Plan's purchase of 100% of the equity interest in BHG as part of the ESOP Transaction.

64. In authorizing the ESOP Transaction on behalf of the ESOP, Reliance Trust executed the Master Agreement, ESOP Note, ESOP Credit Agreement, and ESOP Stock Pledge Agreement on behalf of the ESOP.

## Reliance Trust Failed to Negotiate in Good Faith Over the Price Terms and Issuance of Warrants

65.     According to documentation created by Verit, between July 25 and August 28, 2013, the parties agreed on a price of $275 million for 100% of BHG, down from Verit's original demand of $290 million and up from Reliance Trust's initial offer of $250 million.[3]

66.     Reliance Trust also agreed to a 40-year term for the ESOP Note and SARs for eligible employees of 10% of BHG's fully-diluted equity, despite an initial offer of a 30-year term and an 8% SAR pool for the company.  Reliance Trust took a meek posture regarding the terms it did negotiate, conceding to pay the maximum amount authorized by Reliance Trust's Fiduciary Committee to the Former Shareholders while accepting less advantageous terms for BHG, and thus the ESOP, regarding the issuance of SARs and terms of the ESOP Note.

67.     It appears that Reliance Trust did not engage in negotiations with the Company regarding the amount of the $100 million ESOP Note or, for that matter, conduct an evaluation of that transaction and the $100 million price.  No valuation reviewed by Reliance Trust supports this price.

## FIRST CLAIM FOR RELIEF

### (Against Defendant Reliance Trust for Violating Its Fiduciary Duties)

68.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 67 inclusive.

69.     As the ESOP's fiduciary, Reliance Trust had a duty to act prudently and solely in the interest of the ESOP and its participants and beneficiaries.  These duties required Reliance

---

[3] Although the documentation provided disclosed that Reliance Trust negotiated a $275 million purchase price, the Former Shareholders received an additional $3.4 million at closing.

Trust to, among other things, undertake a good-faith investigation of the merits of the ESOP Transaction and any red flags that arose; conduct good faith negotiations over the ESOP Transaction's price and other material terms; and thoroughly review, analyze, and question any valuation report on which it relied. Reliance Trust failed in each of these respects.

70. Reliance Trust failed to scrutinize and critically question SRR's Valuation Report and Solvency Analysis, which raised a number of red flags, including:

    a.    Relying on projections of the Company's future sales and earnings that far outstripped the Company's historical performance;

    b.    Failing to reduce its valuation of the Company's stock based on the dilutive effect of the Seller Warrants;

    c.    Failing to discount the valuation to account for the issuance of SARs and lack of control by the ESOP; and

    d.    Considering only the period from December 31, 2013 through December 31, 2018, in evaluating the Company's solvency, despite the maturation of the Seller Notes occurring outside of this period.

71. Reliance Trust did not negotiate in good faith over the stock purchase price and terms of the ESOP loan. Reliance Trust did not engage in negotiations at all regarding the amount of the $100 million ESOP Note. By conceding to pay the maximum authorized amount to the Former Shareholders while accepting less advantageous terms for BHG, and thus the ESOP, regarding the issuance of SARs and terms of the ESOP Note, Reliance Trust did not even effectively negotiate on behalf of the ESOP for terms that were discussed.

72.     By failing in all of the foregoing respects, Reliance Trust:

a.      caused the purchase of the Company's stock for significantly more than fair market value;

b.      failed to discharge its duties with respect to the ESOP solely in the interest of the participants and beneficiaries of the ESOP and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

c.      failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

d.      failed to act in accordance with the documents and instruments governing the ESOP insofar as such documents and instruments are consistent with ERISA, in violation of ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

73.     As a result of the conduct described above, Reliance Trust caused losses to the ESOP for which it is liable pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

## SECOND CLAIM FOR RELIEF
### (Against Defendant Reliance Trust for Engaging in a Prohibited Transaction)

74.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 73 inclusive.

75.     As a fiduciary to the ESOP, Reliance Trust was prohibited from causing or permitting the ESOP to engage in a transaction that constitutes the sale or exchange of property between the ESOP and a "party in interest" to the ESOP, and was prohibited from transferring any assets of the ESOP to a party in interest.  ERISA sections 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D).

76.     As owners of 10% of the Predecessor Companies' stock at the time of the ESOP Transaction, Tinberg and MacArthur were each a "party in interest" to the ESOP under ERISA section 3(14)(H), 29 U.S.C. § 1002(14)(H).  Tinberg was also a "party in interest" to the ESOP under ERISA section 3(14)(H), 29 U.S.C. § 1002(14)(H), by virtue of his position as BHG's chief executive officer.

77.     As members of BHG's Board, and thus fiduciaries to the Plan, Tinberg, Liggett, and MacArthur were each a "party in interest" to the ESOP under ERISA section 3(14)(A), 29 U.S.C. § 1002(14)(A).

78.     As a fiduciary to the ESOP, Reliance Trust was prohibited from causing or permitting the ESOP to engage in a transaction that constitutes the direct or indirect lending of money or other extension of credit between the ESOP and a "party in interest" to the ESOP.  ERISA section 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

79.     The ESOP Transaction, as a matter of economic reality, was comprised of the direct sale of stock by BHG to the ESOP and the indirect transfer by the ESOP of $278.4 million in cash, notes, dividends, warrants, and other consideration to purchase of all of the Former Shareholders' stock, subject to the warrants' terms.

80.     By causing the ESOP to purchase the Predecessor Companies' stock from Tinberg, Liggett, and MacArthur at a price in excess of fair market value, and pursuant to the ESOP Transaction, Reliance Trust:

      a.    caused the ESOP to engage in a transaction that it knew or should have known constituted the sale or exchange, or leasing, of any property between the ESOP and parties in interest, in violation of ERISA section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A);

      b.    caused the ESOP to engage in a transaction that it knew or should have known constituted the lending of money or other extension of credit between the ESOP and parties in interest, in violation of ERISA section 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B); and

      c.    caused the ESOP to engage in a transaction that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

81.     As a result of the conduct as described above, Reliance Trust caused losses to the ESOP for which it is liable pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

## THIRD CLAIM FOR RELIEF

### (Against Defendant Reliance Trust for Entering into Indemnification Agreement that is Void under ERISA)

82.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 81 inclusive.

83.     ERISA section 410(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). A fiduciary is impermissibly relieved of responsibility or liability for its ERISA fiduciary duties when an ERISA plan itself bears some of the burden of indemnifying a fiduciary for its fiduciary breaches. See 29 C.F.R. § 2509.75-4.

84.     As set forth in paragraph 21 above, the indemnification provision in Reliance Trust's Engagement Letter could require the Company—and, in turn, the ESOP as the Company's sole owner—to pay all of Reliance Trust's losses, costs, expenses and damages incurred in connection with any legal proceeding relating to Reliance Trust's performance as the ESOP's trustee in circumstances in which Reliance Trust has violated its fiduciary duties under ERISA.

85.     By potentially requiring the ESOP to indemnify Reliance Trust even where it has breached its fiduciary duties, the indemnification provision is void under ERISA section 410(a), 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.      Requiring Reliance Trust to restore all losses caused to the ESOP as a result of Reliance Trust's fiduciary breaches, plus interest.

2.      Requiring Reliance Trust to disgorge, and restore to the ESOP, all fees earned from the ESOP Transaction and fees subsequently paid to it as ongoing trustee of the ESOP and the ESOP's assets.

3.      Enjoining Reliance Trust from acting as trustee, fiduciary, or service provider in any ESOP transaction.

4. Declaring the indemnification provision in the Reliance Trust Engagement Letter void under ERISA, enjoining Reliance Trust from seeking or receiving any payments under this indemnification provision, and requiring Reliance Trust to repay to the Company any amounts paid by the Company pursuant to this indemnification provision.

5. Granting such other relief as may be equitable, just and proper.


Dated:  April 22, 2019                          Respectfully Submitted:

                                                KATE S. O'SCANNLAIN
                                                Solicitor of Labor

                                                G. WILLIAM SCOTT
                                                Associate Solicitor
                                                Plan Benefits Security Division


                                                GLENN M. LOOS
                                                Counsel for Litigation

                                                 _/s/ Wayne R. Berry_____
                                                WAYNE R. BERRY
                                                NDIL Bar # 429661
                                                DC Bar # 429661
                                                Senior Trial Attorney

                                                STEPHINE B BITTO
                                                ISIDRO MARISCAL
                                                Trial Attorneys
                                                United States Department of Labor
                                                Office of the Solicitor
                                                Plan Benefits Security Division
                                                P.O. Box 1914
                                                Washington, D.C.  20013
                                                Berry.Wayne@dol.gov
                                                Direct:  (202) 693-5585
                                                Facsimile:  202-693-5610

                                                Attorneys for Plaintiff, R. Alexander Acosta,
                                                Secretary of Labor, United States
                                                Department of Labor